**UNITED STATES v. BUCK et al., and three other cases.**

Nos. 13646, 13648, 13650, 2890.

District Court, W. D. Missouri, W. D.

Feb. 10, 1937.

214

Maurice M. Milligan, U. S. Atty., and Randall L. Wilson and Thomas A. Costolow, Asst. U. S. Attys., all of Kansas City, Mo., for the United States.

James Daleo, I. J. Ringolsky, William Boatright, Harry Jacobs, and Ludwick Graves, all of Kansas City, Mo., for defendants.

OTIS, District Judge.

Indictments having been returned in criminal cases 13646, 13648, and 13650, the defendants in those cases were, on the 14th day of January, 1937, duly arraigned. They entered pleas of not guilty, requesting leave, however, thereafter to withdraw their pleas should they decide to attack the indictments. They were advised in open court that the cases would be tried on Monday, February 15, 1937, but that they might, within two weeks, withdraw their pleas of not guilty and file such motions as they might wish to file. The two weeks' period of limitation was enlarged thereafter. Within the enlarged time the defendants in each of the criminal cases filed (1) a demurrer and motion to quash and also (2) a plea in abatement. At nearly the same time at which these pleadings were filed, defendants and others (the others are defendants in other criminal cases of a similar nature) filed, as an independent suit, (3) a bill in equity, wherein they are complainants and the United States Attorney is defendant. The relief sought by this bill is an injunction against the prosecution of the several criminal cases wherein complainants are defendants. In each of the three criminal cases the United States Attorney has filed a motion to strike out the plea in abatement and in the proceeding in equity he filed a motion to dismiss. All of these various matters now have been submitted. There stand now for decision (1) the demurrer and motion to quash in each of the three criminal cases; (2) the plea in abatement, and (3) the motion to strike out the plea in abatement in each of the three criminal cases; (4) the mo-

tion to dismiss the proceeding in equity; and (5) the application of the complainants in the equity proceeding for a temporary injunction. Avoidance of unnecessary duplication will be achieved if all these several matters are dealt with in a single memorandum.

I. Demurrers and Motions to Quash.

The indictment in each of the three cases substantially is identical with the indictments in the other two cases. The demurrer and motion to quash in each case raises essentially the same questions as are raised by the demurrers and motions to quash in the other two cases. It will be enough, therefore, if we consider only the questions raised by the demurrer and motion to quash in case 13646.

While the demurrer and motion to quash in case No. 13646 sets out 23 grounds for the prayer that the indictment be dismissed, and while learned counsel for the defendants in oral argument were careful to say that none of these grounds was waived, we shall discuss here only those grounds which counsel thought worthy of oral presentation. A discussion of them, however, must be preceded by a brief description of the indictment and a short summary of its allegations.

The Indictment in Case No. 13646.

The indictment attempts to charge an offense under section 51, title 18, U.S.C. (18 U.S.C.A. § 51). It is provided in that section (so far as is pertinent here) as follows: "If two or more persons conspire to injure, * * * any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States * * * they shall be fined * * * and imprisoned * * * and shall, moreover, be thereafter ineligible to any office."

The indictment is in two counts. Since the attack on each count of the indictment is identical with the attack on the other (excepting that one ground of attack on count I is relied on which is not applicable to count II) we shall restrict our description of the indictment to a description of count II. It is charged in count II:

1. That there were a number of citizens (they are not named), to be designated as "voters," residing in precinct 15 of ward 12, Kansas City, Jackson County, Missouri, entitled to vote for a person to fill the office of representative in Congress at the general election to be held November 3, 1936, and "to the right and privilege to have

their votes and each of them \* \* \* accurately, honestly and truthfully counted, recorded, certified and returned as cast."

2. That there was duly and legally held in the precinct, ward, etc., theretofore described, on November 3, 1936, a general election for the purpose of electing, among other officers, a representative in Congress.

3. That at . that election defendants Buck, Brenner, Doss and Davis were election judges and defendants Tucker and Eaton were clerks, assuming to discharge the respective duties and obligations of such offices.

4. That at the election held on November 3, 1936, each of the "voters" made out, marked registered, and cast his vote on the ballot provided therefor, for the Republican candidate for the office of representative in Congress.

5. That the defendants, on and prior to the 3rd day of November, 1936, conspired together to injure the "voters" aforesaid in the free exercise and enjoyment of the right and privilege to vote for a person for the office of representative in Congress and to have their votes, and each of them, accurately, honestly and truthfully counted, recorded and certified as actually and in fact cast. That said conspiracy was in substance as follows: That after the said voters had made out and cast their votes on the ballots provided therefor, and after the ballots had been deposited in the ballot boxes, the defendants would falsely, fraudulently and untruthfully count, record and certify and permit to be falsely, fraudulently and untruthfully counted, recorded and certified to the Board of Election Commissioners the votes of said voters, and each of them, as having been actually and in fact cast by said voters for a candidate opposing the person for whom said votes were actually and in fact cast.

6. The indictment closes with charging a series of overt acts alleged to have been committed by one or more of the defendants.

### How Indictment is Attacked.

The first attack on count II of the indictment is put by learned counsel for defendants in the following language (we quote from their brief): " \* \* \* the \* \* \* right or privilege referred to in section 51 is a \* \* \* personal right \* \* \* not the \* \* \* non-judicable one common to all that the public shall be protected against harmful acts \* \* \*

the right of the candidates and the voters in the state at large \* \* \* are not rights or privileges cognizable under this statute. \* \* \* there is a point and limit at which the injury or oppression must be deemed to have been an injury to the candidate and to the voting citizenry at large and not an oppression of the individual citizen or denial to him of the exercise of his individual, personal right \* \* \* the mere fact that the vote of a citizen in a Congressional election is virtually nullified by wrong and fraud is not enough \* \* \* it is plain that the conspiracy to which the indictment addresses itself is an injury to voters collectively \* \* \* and \* \* \* to the Republican candidate, in crediting votes cast for him to the Democratic candidate. By and large the indictment speaks of a wholesale fraud and a conspiracy to encompass a wholesale fraud with no particular intent at all on the part of the conspirators to affect any person in his individual right, save as that was a necessary consequence of the broader conspiracy \* \* \* the conspiracy really was to affect merely the election result and the interest of voters as a class."

Now, it must be conceded that learned counsel for defendants are right in their contention that the right and privilege of the citizen which is referred to in section 51 is a personal right and not merely that nonjudicable right which every citizen has that the public shall be protected against harmful acts. It must be conceded that if count II of the indictment does not charge a conspiracy to injure or oppress a citizen in such a personal right as is referred to in the statute, no crime is charged. It is idle to deny, however (we do not understand that it is denied by counsel), that the right which a citizen has to cast one vote for a member of Congress and to have that vote counted as cast is such a personal right as the statute refers to. Counsel for defendants have not erred in their statement of the law; they have erred in its application to this indictment. This indictment does not charge merely an indirect injury to the personal right of an individual voter such as would result from the nullification of his vote, (1) by placing in the ballot box a vote that has been bought and paid for, or (2) the vote of another not entitled to vote, or (3) the vote of an entirely fictitious and nonexistent person (it may be conceded arguendo that to place such votes as these in the

ballot box and so to nullify honest voters' ballots only indirectly injures honest voters, provided their votes are counted as cast). The indictment here charges that the defendants conspired to count the vote of voter X, cast by X for candidate A, not for candidate A, for whom it was cast, but for candidate B, his adversary. Now, if the right to vote for a candidate of one's own choice for the office of Representative in Congress and to have that vote counted as cast is such a right as is referred to in section 51 (which is conceded), then it is beyond argument that to refuse to count that vote for the candidate for whom it was cast injures the voter as directly as if he were forbidden to cast his vote at all. It is a double injury to the voter when, as is charged was the case here, the vote is not only not counted for the candidate for whom it was cast, but counted for his adversary.

A second attack on the second count of the indictment is put in the brief by learned counsel in the language following:

"The indictment is fatally defective in that it nowhere charges that the object of the conspiracy was not to count the ballots for the Congressional candidate for whom they were cast.

"The conspiracy is alleged to be * * * (that) after the voters had cast their votes, the defendant would count, record and certify same as having been cast for a person who was a candidate opposing the person actually voted for. * * *

"The sum and substance of this simply is that these Republican ballots were to be counted as votes for the Democratic candidate. This in and of itself is not enough. * * * It does not matter if this ballot was counted for one candidate or two candidates or fifty candidates, or opposing candidates, if it was counted once for the candidate for whom it was cast. * * *

"Strangely enough, the indictment, while charging the counting of the ballot for the Democratic candidate, nowhere charges it was not counted for the Republican candidate. This glaring, obvious omission must be deemed to have been deliberate."

This attack on the indictment scarcely is worthy of the high intelligence of very able and honorable counsel who make it. When it is said that the language of the indictment, "That after said voters * * * had duly and legally made out, marked, registered and cast their votes as aforesaid (for the election of a legally qualified person to the office of Representative in Congress) * * * the votes of said voters as they * *. * meant, intended and desired said votes to be counted, recorded, certified and returned * * * (the defendants) would * * * falsely, fraudulently, untruthfully and corruptly count, record and certify * * * as having been actually and in fact cast by said voters for a person who was a candidate opposing the person for whom said votes were actually and in fact cast, * * * and so that the votes of all of the said voters * * * would be given and credited to a person who would not deserve or be entitled to the same, * * *" when it is said that that language does not charge, except by inference, that the votes cast were not counted as they were cast, the plain meaning of language is disregarded. To say that a charge that a vote which X has cast for A was falsely counted for B is not the equivalent of saying that it was not counted for A is indeed "to divide a hair twixt north and northwest side."

The third attack made on the second count of the indictment is put in the brief by learned counsel as follows:

"The indictment (Count II) is fatally defective in that it does not clearly charge injury in respect of a right to vote for a representative in Congress. * * *

"* * * in detailing the substance and effect of the conspiracy same is charged to be that after the voters cast their votes (the indictment does not say for representative) the defendants would falsely count same 'as having been actually and in fact cast by said voters for a person who was a candidate opposing the person for whom said votes were actually and in fact cast' (the indictment does not say a candidate for representative or that the person voted for was a candidate for that office). * * *

"* * * all that is affirmatively charged the conspiracy was to do, was to falsely count, record and certify votes actually cast as having been in fact cast for 'a person who was a candidate opposing the person for whom said votes were actually cast.' The full measure of this conspiracy could have been carried out by recording the votes for opposing candidates for president or governor or lieutenant governor. * * *"

Again, with the greatest possible respect for learned counsel, we fear this

argument falls in the same class with the argument immediately preceding it. As we understand the argument, counsel are contending that it is not clear from the indictment that the alleged false counting and certification of votes were of those cast for a candidate for Congress. The argument is untenable in the face of the plain and clear language of the indictment which, in so many words, charges that voters made out and cast their ballots for the Republican candidate for election to the office of Representative in Congress, that the defendants conspired to injure them in the exercise of their right and privilege to vote for a person for the office of Representative in Congress; that after they had made out and cast their votes for a person for the office of Representative in Congress (the language of the indictment is "after said voters and each of them had duly and legally made out, marked, registered and cast their votes as aforesaid" thus incorporating previous references to the particular office for which voters were voting) the defendants falsely, etc., counted, recorded, and certified the votes so cast "so that the votes of all of said voters voting for the duly and legally qualified person who was then and there the candidate of the Republican party for election to the office of Representative in the Congress of the United States of America to represent the people of the Congressional District aforesaid * * * and who would deserve and be entitled to the same, would be given and credited to a person who would not deserve or be entitled to the same, and who was actually the candidate of the Democratic party."

The last of the attacks orally made on the indictment (and we quote again the language of counsel in the brief) is that—

"The indictment fails to advise the accused of the nature and cause of the accusation with sufficient definiteness in order that they may meet the accusation and prepare for trial (in that)

"(a) It alleges the existence of a number of qualified voters * * * and that the object of the conspiracy was to injure and oppress these voters * * * some identification of the particular ballots referred to is necessary in order that the defendants may properly prepare their defense and in order that the particular votes and voters may be ear-marked and identified to prevent further prosecution for the same offense. * * *

"(b) The indictment should have set out the documents and written instruments referred to therein in substance or in exact form. These documents are the ballots, the tally sheets, the duplicate statements and the certificates. * * *"

As to subdivision (b) of this last attack, it is sufficient to say that the indictment does set out in substance all that defendants demand. To say that the indictment should set out in extenso all of the ballots cast in the precinct and referred to in the indictment, all of the tally sheets, all of the certificates, is, of course, absurd.

As to subdivision (a) of this attack, it may be said that on the argument the United States Attorney offered in open court, if a motion for a bill of particulars was filed by the defendants, at once to supply them with the exact information they say they need adequately to prepare their defense, that is, to give them the names of the voters referred to in the indictment. The argument of counsel is, however, that the indictment is fatally defective unless originally, as returned by the grand jury, it contains these names. In other words, we have here in effect a confession that defendants do not really wish to be informed as fully as they can desire, but that they wish to complain that they have not been informed in the precise manner contemplated by the law. At most, it is the exaltation of the very letter of the law. That it is not required even by the letter of the law is declared by the only appellate federal tribunal which has spoken on the subject. United States v. Pleva (C.C.A.2) 66 F.(2d) 529, 531.

### Special Attack on Count I.

Clearly the right or privilege of a citizen to which reference is made in section 51, for the protection of the free exercise and enjoyment of which that section was enacted, is a right or privilege "secured to him by the Constitution or laws of the United States." Such is the very language of the statute. Learned counsel for defendants in the criminal cases, recognizing that the right of a citizen to vote for a member of Congress and to have that vote counted as cast is a right secured to him by the Constitution (as obviously it is: Const. art. 1, § 2; Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 158, 28 L.Ed. 274) deny that the right of a citizen to vote for presidential electors is in the same category. They contend, therefore, that count I of the indictment, which refers only to

votes cast for presidential electors, charges no crime.

The opinion of the Supreme Court in Ex parte Yarbrough, supra, leaves us in no doubt as to the ground upon which it must be ruled that the right of a citizen to vote for a member of Congress is secured by the Constitution of the United States. In effect, it is set out in the opinion in that case that the right to vote for a member of Congress is conferred by the Constitution of the United States. Of course, if a right is conferred by the Constitution, it is secured by the Constitution (it might be secured by the Constitution, although not also conferred by the Constitution). But how is it conferred by the Constitution of the United States?

The right of a citizen to vote for a member of Congress is conferred by the Constitution of the United States by the following language in section 2 of article 1: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

The Supreme Court said touching this language:

"They [the state legislature] define who are to vote for the popular branch of their own legislature, and the constitution of the United States says the same persons shall vote for members of congress in that state. It adopts the qualification thus furnished as the qualification of its own electors for members of congress.

"It is not true, therefore, that electors for members of congress owe their right to vote to the state law, in any sense which makes the exercise of the right to depend exclusively on the law of the state. * * *

" [Referring to Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627] * * * it was said the constitution adopts as the qualification for voters of members of congress that which prevails in the state where the voting is to be done; therefore, said the opinion, the right is not definitely conferred on any person or class of persons by the constitution alone, because you have to look to the law of the state for the description of the class. But the court did not intend to say that when the class or the person is thus ascertained, his right to vote for a member of congress was not fundamentally based upon the constitution, which created the office of member of congress, and declared it should be elective, and pointed to the means of ascertaining who should be electors."

We must say then that the reasoning supporting the conclusion that the right of a qualified voter to vote for a member of Congress is conferred upon him by the Constitution of the United States is this: (1) The Constitution provides that members of Congress shall be chosen by such electors in each state as shall have the qualifications requisite for electors of the most numerous branch of the state legislature; (2) when such qualifications have been prescribed by a state Legislature, they are adopted by the United States and in effect incorporated by reference in the Constitution of the United States. So, if in Missouri, for example, the Legislature has prescribed that all citizens over 21 years of age, with certain residence requirements, shall be qualified to vote for members of the most numerous branch of the state Legislature, then section 2 of article 1 of the Constitution is to be read as if it provided: "The House of Representatives shall be composed of members chosen every second year by the people of the several states. The electors in Missouri shall be all citizens of the United States over twenty-one years of age, the electors in Maine, etc."

The right to vote for members of Congress then in Missouri is conferred upon all citizens over 21 years of age by the Constitution of the United States.

In the light of the reasoning by which this result was reached by the Supreme Court, let us consider the language of the Constitution governing the selection of presidential electors. It is provided in section 1 of article 2, as follows:

"The executive Power shall be vested in a President of the United States of America. He shall * * * be elected, as follows

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors."

Now it must be conceded that under these provisions it would be competent for the Legislature of Missouri to provide that the presidential electors from this state should be chosen by the Legislature of the state (or in any other manner consistent with a republican form of government). That power, thus conferred upon the Legislature of Missouri by the Constitution of

the United States, has been exercised by the Legislature of Missouri, which has provided that—

Section 10730, R.S.Mo.1929 (Mo.St.Ann. § 10730, p. 3946). "Hereafter, at all elections held in this state for the offices of president and vice-president of the United States, the electoral district shall be the same as the congressional districts into which the state shall be divided."

Section 10733 (Mo.St.Ann. § 10733, p. 3947). "The qualified voters in each of said districts shall meet at their respective places of holding elections * * * and shall proceed to elect as many fit persons as the state shall then be entitled to elect, as electors of president and vice-president."

Exactly the same reasoning as was followed by the Supreme Court in Ex parte Yarbrough requires us now to read the constitutional provisions touching presidential electors as if they were written:

"The executive power shall be vested in a President of the United States of America. He shall * * * be elected as follows:

"In Missouri the electors shall be elected by the qualified voters of the state, in Maine etc."

But if we do interpret the constitutional provision as if it were written in the manner indicated, then we have the right to vote for presidential electors conferred upon qualified voters in Missouri by the Constitution of the United States just as in the case of the right to vote for members of Congress. In other words, the provisions of law in Missouri governing the choice of presidential electors are adopted by the Constitution of the United States and incorporated in that Constitution. While the Constitution gave to the Legislature the discretion of choosing between the several possible methods of selecting presidential electors for the state, when it does choose a method, the authority for that method is to be found in the will of the nation as expressed in the Constitution and not in any original power of the legislatures of the state.

Exactly upon the same reasoning then as that which was employed by the Supreme Court of the United States, we have reached the conclusion that the right of qualified voters in Missouri to vote for presidential electors does depend upon the Constitution of the United States and is conferred by that document.

The demurrers and motions to quash should be overruled.

## II. Pleas in Abatement.

Each of the pleas in abatement is bottomed upon the one contention that the charge of the Honorable Albert L. Reeves, senior judge of this court, to the grand jury which returned these indictments was "intemperate, inflammatory, argumentative, prejudicial and impassioned and designed and calculated to inflame and excite the passion and prejudice of said grand jury against the defendants." The argument from this contention is that the action of the grand jury was not really its independent action, that, therefore, in reality, the defendants have not been indicted by a grand jury at all, as required by the Constitution, that what purport to be indictments by a grand jury are no more than accusations by the judge. If one were to read only parts of the pleas in abatement, not reading the excerpts from the charge, he would gain the impression that the judge had singled out and named the defendants and had ordered indictments whether or not there was evidence to support them.

We do not have the entire charge before us. It was developed at the argument on the pleas in abatement that the whole charge is not here. Judge Reeves had proceeded for more than thirty minutes upon his charge before a stenographer began to take down in shorthand what he was saying. It is to be presumed, of course, that in the whole charge the full duty of the grand jury was set out, especially including the admonition always given that the grand jury will return no indictment against any one except upon competent testimony by sworn witnesses establishing every element of the offense concerning which inquiry is made. That admonition appears indeed again and again even in the portions of the charge submitted to us.

In what we have of the charge there is nothing whatever to justify the contention that Judge Reeves so inflamed the minds of the grand jurors against the defendants as that it was not a grand jury by which they were indicted, but only a group of puppets, robbed of their reason, forgetful of their oath. A reading and a rereading of the excerpts from the charge presented to us discloses that there is not in the whole charge a single reference to a single one of the defendants. None of the defendants is mentioned. There is no reason to believe that Judge Reeves had any knowledge

220

whatever of the identity of any of the defendants or his connection with the election of November 3d. Learned counsel realize that in this complete absence of any reference to the defendants is a great weakness in their ground for urging abatement of the indictments. So they assert that if the defendants were not mentioned by names, at least the class of persons to which they belong was singled out. It is said that the judge, charging the jury, denounced judges and clerks of election as the persons who had violated the ballots of citizens and that defendants belong to that class.

But the only references in the charge to judges and clerks of election are the following: "It is my information that many individuals who enjoyed the constitutional right to cast their vote and did so, that the votes of these individuals were diverted from the ballot box. The names of such individuals will be given to you, and also the names of the persons who took these ballots and destroyed them, and put false ballots in the ballot boxes will be given to you. If you are confronted with cases of that sort, then bear this in mind, that the person who did that is guilty. Those who permitted the offense, whether an election judge, whether an election clerk, or whether a challenger, they were responsible, or whoever they might be, if they knowingly did that, they are guilty, even though they did not cast the illegal ballot. * * * Now, again my information is that, and I understand that witnesses to this fact will be before you, that there were men and women who cast their ballots in certain precincts, and when the judges and clerks of these precincts certified their votes, they did not certify the votes of those citizens. The law is that the judges and clerks of the election must certify the votes as they are actually cast, and if they failed to do that, then these judges and these clerks violate the law, and are subject to prosecution for thus having violated the law. * * * It may be in evidence that—just by way of illustration, that eighty votes were cast in a precinct, and when the balloting and the polls were closed, the votes were counted and certified. Only four or five votes were certified from such a precinct. If you find that, then the judges or the clerks, or somebody is responsible for it. It makes no difference who they are, they are law violators. * * * If any man, no matter what his position, attempts to corrupt the ballot box, then that man should be prosecuted. It makes no difference what his position may be. If you find that any of these individuals, the challengers, the judges, the clerks, the inspectors, or any of them, worked together to corrupt the ballot box, then, gentlemen, it is a conspiracy to violate the laws of the country. It makes no difference who it is, whether the judges or the clerks, or whether it be those in higher authority * * *. If there be but two men, and they are the only two in a precinct casting their votes one way, these men enjoy citizenship rights and privileges that are precious to them, and have the right to have those votes certified and published to the world that two votes are cast one way or another. They have a right to that, and the judge or clerk of election who fails to certify these two votes has violated the law. * * * The judges and clerks are not justified even if there be an overwhelming majority of votes one way to say we will certify the majority, but we will not certify the minority. It isn't for the judge or clerk to say that they shall not be certified."

Such are the only references to judges and clerks of election in the extracts of the charge which have been submitted to us. And even these references (to which we suppose, when they are thus gathered together and set down in black and white, no one can object) were not references to judges and clerks in any single precinct or in any small number of precincts, nor even in the whole of a great city of approximately 400,000 inhabitants. The references were to such judges and clerks as were shown by the evidence to be guilty of wrongdoing in the entire Western District of Missouri, made up of 66 counties, inhabited by nearly two millions of people.

The real, although unspoken, complaint as to the charge of Judge Reeves, is not that it singled out the defendants or any of them, or that it singled out even a class of persons to which the defendants belong, but that it was an earnest, an eloquent, a powerful denunciation of crimes against ballot boxes in Missouri and a stirring appeal to the grand jury fully to discharge its duty. Defendants do not believe the judge should have manifested in his charge his detestation of this particular type of crime. He should have denounced piracy in the South Seas but not election thievery in Missouri, he should have exhibited indifference, he should have been luke warm in his charge, he should have soft-pedaled the matter, he should have said: "Gentle-

men, of the grand jury, 'everybody's doing it,' let it pass," he should have washed his hands of all responsibility for what might be done by the grand jury. But Judge Reeves had a different conception of the duties of his high office; he believed a judge should be more than an ornament, that he should be a potent force for law and order and common decency.

The whole answer to the contention of learned counsel may be put in one sentence. If this charge to the grand jury aroused the members of that body to a full sense of their duty, if it inflamed their minds, not against individuals, but against crime, if it stirred them up to realize that no consideration should be allowed by them to come between them and the discharge of their duty, then it was but an elaboration of the great and historic oath they had taken. If the charge was inflammatory, the oath was inflammatory. No man whose mind is not already burning with zeal against the enemies of society and the nation's laws, who is not determined at any cost when called upon to serve his country to do his full part, no such man is fit to serve either on a grand jury or on the bench.

Certainly none of these indictments should be abated unless it is believed that the grand jury was actuated by some prejudice resulting from the charge. If one reading the charge truthfully can say, "I think the grand jury would have indicted the defendants by reason of this charge alone, without testimony tending to establish the several elements of the offense and tending to connect the defendants with it," then perhaps abatement of the indictment might be considered. No such conclusion will be reached by any one who reads the charge, unless he seeks any possible way to avoid trials of the defendants. No one who reads any of the indictments involved here will have the slightest doubt but that it was returned upon evidence, not from passion. Each indictment bears internal proof as to what evidence was presented to the grand jury. Obviously, each indictment was the result of the testimony of sworn witnesses. Obviously, the grand jury itself counted the ballots in the boxes and compared the result of that count with the certification signed by the defendants. It is evident that learned counsel for defendants do not question but that the indictments were returned upon the evidence which the grand jury heard, for they have made no attempt to show that there was no evidence offered to the grand jury to support the indictments, and they had the legal right to do that.

We have not discussed in this connection decisions of the courts. There are no pertinent decisions of federal courts to be discussed. Through the long history of the Republic federal judges have been charging grand juries. They have been appealing through all that history to grand juries to do their duty. Whenever it has been necessary they have sought to arouse grand juries to a realization of the results which follow from permitting crimes to go unprosecuted. In not a single instance has one federal indictment been abated by reason of the earnestness and determination displayed by the judge in his grand jury charge. In this fact alone is a powerful argument against these pleas.

We think the pleas in abatement should be overruled. Since they are overruled on the merits, the motions to strike the pleas in abatement also should be overruled.

III. Motion to Dismiss Bill in Equity.

The bill in equity in Porter et al. v. Milligan etc., Equity No. 2890, is bottomed on the same ground as the pleas in abatement which we have just discussed, that is, upon the nature of the charge to the grand jury. What we have said touching that matter in connection with the pleas in abatement need not be repeated. If, as we have ruled, we are not justified by reason of the charge in sustaining the pleas in abatement, then we must sustain the motion to dismiss the bill which has no other foundation than the complaint as to the charge.

Very probably there is another ground upon which the motion to dismiss the bill should be sustained and that is that, in no event, have complainants stated facts entitling them to the equitable relief of injunction against the prosecution of criminal cases.

The remedy which complainants have at law (by pleas in abatement in the criminal cases) seem to us entirely adequate. But if that should not be true, certainly the facts alleged in the bill do not take this case from the application of the general rule, that a court of equity has no jurisdiction to enjoin the prosecution of a crime.

Complainants have attempted to bring their case within a recognized exception to the general rule, that equity will interfere to prevent prosecutions under an invalid statute or ordinance where prosecutions be-

222

gun and threatened will effect irreparable injury to property. But the indictments here do not aim at property rights or the use or exercise of such rights. Complainants' title to their offices certainly are not directly involved in the criminal cases pending against them. If, because they are convicted (should that result ensue), the state of Missouri may remove them from their offices, that obviously is an indirect result, that is merely consequential, of their prosecutions in this court.

█ Learned counsel for complainants have argued that a court of equity has jurisdiction to enjoin the prosecution of a criminal case, even absent threatened irreparable injury to property or property rights, if the prosecution involves any deprivation of constitutional right (as, in this instance, the right to be indicted by an impartial grand jury) plus "exceptional circumstances." "The true basis," say counsel (we quote from their brief), "of the right of equity to act * * * is to afford adequate protection of constitutional rights." We do not understand that counsel mean to maintain that the prosecution of any criminal case may be enjoined if only the defendant in that case has raised a constitutional issue. No such contention successfully could be maintained. It is the constitutional issue plus such "exceptional circumstances" as make legal remedies inadequate which, in the view of counsel, support interference by a court of equity.

Counsel are put to it to find inadequacy in the legal remedy to which they have in fact resorted, namely, pleas in abatement, and so to show the applicability of their legal doctrine. They attempt to show inadequacy of the legal remedy in this manner. They say, "If A, B and C are charged in one indictment with the conspiracy denounced by Section 51 and contend that the grand jury was improperly charged, they have, by a plea in abatement, an adequate remedy at law. D, E and F, similarly charged in another indictment, have also an adequate legal remedy. So have G, H and I, charged in a third indictment. But if A, B, C, D, E, F, G, H and I join as complainants in one bill in equity to restrain the prosecution of all of the three criminal cases their three separate legal remedies are less adequate than one joint equitable remedy. Equity has jurisdiction to avoid a multiplicity of suits."

We are not greatly impressed with this reasoning. It leads to such an unthinkable result as this: If 10 or 20 or 100 are charged in separate indictments with different (although similar) crimes, although they have no common interest whatever, except that they have similar defenses, they may join in one bill in equity to restrain prosecutions of all the indictments, and that to avoid a multiplicity of suits. If there were no other error in this reasoning, certainly it involves an erroneous use of the "multiplicity of suits" ground of equity jurisdiction. The multiple suits must be in some way tied together. Suits are not tied together merely because they involve similar questions of law.

The motion to dismiss the bill should be sustained. Such a disposition of the bill disposes also, of course, of the application for a temporary injunction.

### Orders.

Defendants' demurrer and motion to quash in each of criminal cases Nos. 13646, 13648, and 13650, having been duly considered by the court and the court being fully advised in the premises, is by the court overruled. It is so ordered. To this order all of the defendants in each case are jointly allowed an exception and each of them is allowed an exception.

Defendants' plea in abatement in each of criminal cases Nos. 13646, 13648, and 13650, having been duly considered by the court and the court being fully advised in the premises, is by the court overruled and denied. It is so ordered. To this order the defendants in each case jointly are allowed an exception and each of the defendants is allowed an exception.

The plaintiff's motion to strike the plea in abatement in each of criminal cases Nos. 13646, 13648, and 13650 having been duly considered by the court and the court being fully advised in the premises, is by the court overruled. It is so ordered. To this order the plaintiff is allowed an exception.

The motion of defendant to dismiss the bill in equity case No. 2890 having been duly considered by the court and the court being fully advised in the premises, is by the court sustained. The bill is dismissed. It is so ordered. To this order the complainants jointly are allowed an exception and each of them is allowed an exception.