MATTER OF S—

In EXCLUSION Proceedings

A-10494958

*Decided by Board May 15, 1962*

Inadmissibility—Crime prior to entry—Conspiracy.

(1) Conviction on a plea of guilty to a general conspiracy stated in one count to commit, among other offenses, the crimes of forgery in the third degree and uttering a forged instrument, which are crimes involving moral turpitude, is conviction of a crime involving moral turpitude and appellant is excludable under section 212(a)(9) of the 1952 Act.

(2) A plea of guilty to a conspiracy count is a plea to the entire count in the absence of a showing to the contrary.

EXCLUDABLE: Act of 1952—Section 212(a)(9) [8 U.S.C. 1182(a)(9)]—Convicted of crimes involving moral turpitude, to wit: Assault and battery (N.J., 1927); failure to file State income tax return (Calif., 1926); conspiracy, gambling and owning and operating a gambling establishment (N.Y., 1956).

Act of 1952—Section 212(a)(20) [8 U.S.C. 1182(a)(20)]—No immigrant visa.

Act of 1952—Section 212(a)(27) [8 U.S.C. 1182(a)(27)]—Entry prejudicial to the public interest.

BEFORE THE BOARD

**DISCUSSION:** Appellant is 61 years old, a native of Russia, who was first admitted to the United States for permanent residence in July 1912, accompanied by other members of his family. He was naturalized in 1930, but his citizenship was revoked in July 1958. See *Stacher* v. *United States*, 258 F.2d 112 (C.A. 9, 1958), cert. den. 358 U.S. 907. The Court of Appeals sustained the finding of the District Court that despite the passage of 28 years, the Government had established "by clear, unequivocal and convincing evidence that the defendant under oath had stated he had no previous arrests," while in fact appellant had "a prior criminal record." The court had before it other matters of proof and jurisdiction not pertinent here. The court recited appellant's nine arrests between 1924 and 1928, prior to his naturalization, most of them for "assault and battery" or for "atrocious assault and battery." He was convicted on

688

only one of these charges; his arrest for "atrocious assault and battery" was reduced to assault and battery, for which he paid a fine of $50 at Newark, New Jersey, on December 14, 1927.

Appellant departed from the United States on or about April 10, 1960, and returned on July 19, 1960. He departed again on January 20, 1961, and applied for readmission on March 20, 1961. In connection with his last entry the present exclusion proceeding was instituted. At the time of his return in March 1961 he presented an affidavit in lieu of passport (Exh. 4) and an alien registration receipt card (Form I-151). The special inquiry officer found appellant inadmissible on the first two charges set forth above, under section 212(a)(9) and section 212(a)(20) of the Immigration and Nationality Act. Appellant appeals from the order of exclusion.

The special inquiry officer found that atrocious assault and battery is a crime involving moral turpitude, but conviction for assault and battery is not conviction of a crime involving moral turpitude. The special inquiry officer concluded that appellant did *not* abandon his residence in the United States by making two trips to Italy, one of 3 months' duration and one of 2 months, to see his estranged wife and their 2 children. The special inquiry officer further concluded that the Immigration and Naturalization Service has *not* established that appellant is inadmissible as a person whose entry is prejudicial to the public interest. The special inquiry officer found that appellant's conviction for failure to timely file State income tax returns in California in 1955 is not a crime involving moral turpitude.[1] It is not necessary, therefore, for us to consider further the charge laid under section 212(a)(27).

The special inquiry officer stated that "no probative value" was being given to the testimony of appellant before Congressional committees investigating organized crime in interstate commerce in New York and New Jersey. This testimony and the magazine articles and newspaper clippings referring to appellant's business associates and gambling activities were introduced in support of the "entry prejudicial to the public interest" charge. These exhibits, 11, 12, 13, 18, 19, and 21, are not now admissible for any purpose, except to establish reputation, and have not been given any consideration by us.

Counsel has alleged in briefs and in oral argument that there was a "sly scheme" to entrap the alien. A watch notice was posted for him before he returned from his first trip to Italy, but he returned without being apprehended. He was interviewed by the Immigration Service once between his first and second trips. Following his sec-

---

[1] The special inquiry officer has included in an Appendix to his decision the pertinent section of the various statutes under which appellant has been convicted.

ond trip to Italy a year later, he was apprehended by an inspector who found his name in a "Lookout Book" when he entered via plane at California. Counsel contends that appellant should have been warned by the Immigration Service following his denaturalization that if he went abroad he might not be readmitted, that the Immigration Service has pursued a policy of warning aliens but deliberately refrained from warning appellant. Entrapment is a criminal law concept,[2] and has no appropriate place in this case. Counsel claims that the Immigration Service failure to apprehend him at New York on his first return was "lulling" him into a sense of security (counsel's pre-decision memo, p. 3), and refers to appellant as an "unwary victim." Appellant has had continuous competent legal assistance for years, defending him in criminal prosecutions, representing him when he has testified before various investigatory bodies, and in immigration matters. Counsel declares that, while the usual practice of the Immigration Service is to notify an alien that he *might* be excludable or *could* be excluded upon reentry, in this case the Service delivered to appellant his alien registration card in 1959 without any such warning. The examining officer has stated that at the time the "watch notice" was posted the Service was not aware of appellant's conviction at Saratoga, New York in 1952. An investigator for the Immigration and Naturalization Service at Los Angeles testified that appellant's record was given him in January 1959 for the purpose of registering appellant under the Alien Registration Act. The witness testified that he concluded on the basis of the record then before him that Mr. S— did not fall within the excludable classes. The fact that the Government posted a lookout notice for Mr. S— before his first return from Italy in June 1960 (p. 8, oral argument) at various ports, including the Northeast Region, but failed to apprehend him until the occasion of his second return, does not constitute "entrapment" by the Immigration Service, either on the law or the facts.

Concerning counsel's contention that the Service conduct was improper with regard to appellant's departures and reentries, see *Klapholz* v. *Esperdy*, 201 F. Supp. 294 (S.D., N.Y., 1961), referring to the standard procedure of "Lookout Book," detention by an

---

[2] Entrapment. The act of officers or agents of the Government in inducing a person to commit a crime not contemplated by him for the purpose of instituting a criminal prosecution against him. *Falden* v. *Commonwealth*, 167 Va. 549, 189 S.E. 329, 332. *Lee* v. *State*, 66 Okl. Cr. 399, 92 P.2d 621, 623. But the mere act of an officer in furnishing the accused an opportunity to commit the crime, where the criminal intent was already present in the accused's mind, is not ordinarily entrapment. *State* v. *Cowling*, 161 Wash. 519, 297 P. 172, 174. *Black's Law Dictionary* (Fourth Edition).

immigrant inspector, and parole into the United States pending determination of admissibility.[3]

Counsel states that appellant lives from the proceeds of a $1,000,000 note resulting from the sale of some of his properties in Nevada and that he has not been engaged in gambling activities in the past ten years. *Stacher* v. *United States*, 258 F.2d 112, 116, fn. 11, states that in July 1950 defendant purchased "an interest" costing roughly $91,000 in two corporations, the Bank Club of Nevada, Inc., and the Golden Security Company. According to his tax attorney he sold his interest in the Golden Hotel and the Bank Club of Reno in May 1952 and received $86,000 cash, a one-third interest in the Earl Carroll Theater Building in Hollywood, valued at $97,000, and "Installment Notes" of $1,166,000.

Following his indictment by the Extraordinary Grand Jury on September 8, 1952, sitting in Saratoga County, New York, for the crimes of conspiracy, gambling, owning and operating a gambling establishment, and forgery in the third degree, appellant went to Nevada. A State court in Nevada refused to extradite appellant to New York. The extradition proceedings went to the Supreme Court as *State of Nevada* v. *Stacher*, 346 U.S. 906 (1953), and in a *per curiam* memorandum decision the Supreme Court reversed the Court for the 7th Judicial District of Nevada, citing *Biddinger* v. *Commissioner of Police*, 245 U.S. 128 (1917), and *Pierce* v. *Creecy*, 210 U.S. 387 (1908). *Biddinger* states the rule (p. 134) that a fugitive from justice:

> . . . if found in another State must be delivered up by the Governor of such State to the State whose laws are alleged to have been violated, on the production of such indictment or affidavit, certified as authentic by the Governor of the State from which the accused departed. Such is the command of the Supreme law of the land, which may not be disregarded by any State.
> . . . that when the extradition papers required by the statute are in the proper form the only evidence sanctioned by this court as admissible on such a hearing is such as tends to prove that the accused was not in the demanding State at the time the crime is alleged to have been committed.

*Pierce* v. *Creecy, supra,* is to the same effect saying:

> . . . This indictment meets and surpasses that standard, and is enough. If more were required it would impose upon courts, in the trial of writs of *habeas corpus*, the duty of a critical examination of the laws of States with whose jurisprudence and criminal procedure they can have only a general acquaintance. Such a duty would be an intolerable burden, certain to lead to errors in decision, irritable to the just pride of the States, and fruitful of miscarriages of justice. (p. 405)

---

[3] The court in *Klapholz* had no criticism of this standard procedure and found that a conviction following parole into the United States rendered the alien excludable as a person *convicted prior to admission* of a crime involving moral turpitude, sustaining the finding of the special inquiry officer and the Attorney General, and overruling the Board on this point.

The Supreme Court decided *that the indictment was in the form and certified as required by the law*, and that the appellant did not deny that he was in the State of New York at the time the crime was committed. Counsel contends that the indictment is ambiguous and uncertain. The Supreme Court implicitly found to the contrary. Following the Supreme Court decision appellant returned to Saratoga, New York, and on December 29, 1953, entered a plea of guilty to twenty counts of the indictment pending against him.

Appellant pleaded guilty to the crime of conspiracy as set forth in the first count, and the crimes of gambling and owning and operating a gambling establishment, counts 14 through 32. Appellant pleaded guilty to 20 counts, including the first count, paid a fine of $500 on each count, the total fine amounting to $10,000. In addition, upon motion of the Special Assistant Attorney General, the court sentenced appellant to serve one year in the Saratoga County Jail on his plea of guilty to the crime of conspiracy, and execution of the jail sentence was suspended. The principal question before this Board is the scope of appellant's plea of guilty to the first count. Only if appellant has been convicted of the commission of a crime involving moral turpitude is he excludable from the United States in this proceeding. The only crime found by the special inquiry officer to involve moral turpitude is the crime of conspiracy to commit "forgery in the third degree" and "uttering a forged instrument." It is our conclusion that the appellant's plea of guilty included an admission of guilt of all the offenses set forth under count one.

Counsel has discussed at length, both in briefs and in oral argument, the fact that the indictment and certificate of conviction (Exh. 6) came to us from the Office of the Attorney General of the State of New York, rather than from the Office of the County Clerk of Saratoga County. The certification, part of Exhibit 6, carrying the seal of the Attorney General of New York states: "This is to certify that the attached is an exact copy of an indictment of the Extraordinary Grand Jury of the County of Saratoga, *State of New York* v. *M—L—*, *J—S—*, et al., filed September 8, 1952, on file in this office. This office is the official custodian of the aforesaid records." The certification is signed for Louis Lefkowitz, Attorney General of the State of New York, by Paxton Blair, Solicitor General of the State of New York. A considerable portion of counsel's argument and memoranda have been devoted to the authenticity and source of the copies of the indictment and certificate of conviction. It is his contention that they are not certified under the hand and seal of the Clerk of the Supreme Court of the State of New York for the County of Saratoga, the proper forum, but instead by the Attorney General who declares himself to be the official custodian of

the records. Counsel compares this with the prosecuting attorney sitting in judgment on the merits of the case. This is not a legitimate analogy, because the adjudication was, of course, made by the court.

The record contains (also part of Exh. 6) a letter from the present Saratoga County Clerk stating that he made a search of the records in the County Clerk's office and was able to find no indictment against J—S— on file in that office. He refers the officer of the United States Immigration Service to the Attorney General's office at Albany for papers pertaining to the investigation that have not been filed with the County Clerk. This alien has been engaged in constant litigation, at least since 1952, with denaturalization and extradition proceedings, and income tax, conspiracy and gambling prosecutions. All the papers may have been removed from the office of the County Clerk in connection with any one of these proceedings or other investigations.

We have no doubt as to the authenticity of these documents, even though they came from the Attorney General of the State of New York rather than from the Circuit Court, or the office of the County Clerk. The Certification of the Librarian, State of New York Department of Law (April 25, 1961), covering the order of the Governor of New York of April 2, 1951, and other communications comprising Exhibit 6 indicate that the Office of the Attorney General was a proper custodian and source of these documents.

The "certificate of conviction" recites that the appellant was indicted "for the crimes of conspiracy, forgery in the third degree, gambling and owning and operating a gambling establishment, PL § 580, § 932, § 889, § 970 and § 973, committed in the County of Saratoga, State of New York." The certificate continues by stating that at the arraignment and with the consent of the defendant, J—S—, "the said indictment was amended to charge the defendant with the crimes set forth in counts fourteen through twenty-one, inclusive . . . and the indictment was further amended to add counts twenty-two through thirty-two, inclusive, charging violations of section 970 of the Penal Law on the dates of August 3, 1947 to August 15, 1947." The certificate does not state that count one was amended. The certificate of conviction then continues:

Thereupon, following the amendment of the said indictment as above set forth, the said J—S—, the above-named defendant, pleaded guilty to the crimes of conspiracy, gambling and owning and operating a gambling establishment in violation of section 970 of the Penal Law, constituting the first count, the fourteenth to the twenty-first counts, inclusive, and the twenty-second through the thirty-second counts, inclusive, of said indictment, as amended, to cover the said amended indictment.

The certificate of conviction then recites that the defendant was thereupon sentenced to the fine and penalties as set forth above.

693

Counsel attempted to introduce into the record testimony of appellant as to which portions of the indictment he intended to plead guilty to, on the ground that the certificate is ambiguous. The special inquiry officer refused to permit the testimony. In argument before the Board, counsel stated that appellant pleaded guilty to nineteen substantive counts of gambling or operating a gambling establishment and that he also pleaded guilty to the first count, the conspiracy count, *only as to that portion that dealt with gambling*, because he was not denying an interest in, or that he did, for a time, operate this gambling casino. Counsel argued further that there were 12 nongambling counts in the indictment, dealing with third degree forgery under the New York Code, or obtaining the signature of a person to a written instrument, like a liquor license, with intent to defraud or cheat, but that appellant did not plead guilty to any of the nongambling substantive counts. As to appellant, those counts were dismissed. Counsel states that in the amended indictment "the court added" additional gambling counts (twenty-two through thirty-two), covering different dates, and operating a gambling casino, covering additional dates, and the common gambler count, but that none of the substantive counts to which appellant pleaded guilty covered the forgery charge.

Appellant did not plead guilty to counts two through thirteen. However, the same plan, scheme and organization is described in these counts as that described in the conspiracy count, except that it is described in greater detail. By his pleas of guilty to the other counts he admitted his participation in the plan or "conspiracy." Counts two and three charge appellant and others with unlawfully and feloniously obtaining the signature of certain persons to a summer liquor license in the name of a person who was not actually the sole proprietor and partner in the restaurant, in violation of section 932 of the Penal Law, of "obtaining the signature of a person to a written instrument with intent to cheat and defraud, designedly, by aid of false pretense in violation of section 932 of the Penal Law," the written instrument involved being a lease, and that the coconspirators (five in number), including S—, obtained the signatures of two other persons to an application for a summer liquor license, which application alleged U— to be the *bona fide* proprietor of the premises, that none of the partners had ever been arrested or indicted for any crime, that no person other than U— was interested in the business, or had a lien or mortgage thereon, or had been known by any other name, *etc.*,—all of which allegations the defendants knew to be untrue, and all of which statements were made to defraud the New York State Liquor Authority.

The fourth and fifth counts allege the crime of forgery in the third degree in violation of section 889 of the Penal Law by falsi-

694

fying leases and making a false statement of the financial condition of the Arrowhead Inn through the period August 1, 1946, to August 31, 1946, for the purpose of creating the illusion that the restaurant enterprise was owned and operated independently, that money for rent had been paid out in good faith, and that M—U— had sustained a loss of $31,782 during this period. This count alleges that the statement of financial condition was compiled by defendants in order to conceal from the New York State Liquor Authority the truth concerning the particulars alleged.

Counts 6, 7, 8, 9, 10, 11, 12 and 13 all include S— as one of the codefendants and all allege the crime of forgery in the third degree in violation of paragraph 1 of the first subdivision of section 889 of the Penal Law. These counts include allegations set forth above in other counts and all relate to unlawfully, knowingly and corruptly falsifying writings or financial summaries relating to the operation of the restaurant, alleging sums paid out as rent that had not been paid in good faith; that no actual audit of the books was made as had been alleged; that the statements of financial condition were compiled, prepared, and issued with the intent to defraud the New York State Tax Commission and the Collector of Internal Revenue of the United States who were creditors for income tax purposes of the defendants and M—U—; and that these false statements of financial condition were compiled, prepared, and issued for the purposes, not only of concealing the interests and financial condition of the defendants from the New York State Tax Commission and the Collector of Internal Revenue, but also of deceiving the New York State Liquor Authority. It is alleged that statements relating to the financial condition of Arrowhead Inn omitted material entries with the intent of concealing the fact that the restaurant operated at a substantial loss, that the false entries in financial statements were made with intent also to defraud creditors. Counts twelve and thirteen describe a checking account in a fictitious name in which money (checks) was deposited and withdrawn, this money being the proceeds of gambling conducted at the Arrowhead Inn, and allege that this activity was for the purpose of misleading state and federal tax agents, and that these acts constituted violations not only of section 889 of the Penal Law but also of sections 970 and 973. Mr. S— did not plead guilty to counts two through thirteen described above, but they describe the same scheme as that set forth in count one, and the other substantive counts to which he did plead guilty.

In the indictment (unamended) in our record Mr. S— *is not named* in counts fourteen through seventeen, but *he did plead guilty to these counts*, which allege the crimes of gambling in violation of section 970 of the Penal Law, and of owning and operating a gam-

bling establishment in violation of section 973 of the Penal Law, specifically, of operating and conducting for their personal gain games of chance including roulette, chemin de fer, birdcage and craps, and keeping a building and casino adjacent to the Arrowhead Inn for these purposes.

In counts eighteen through twenty-one appellant is named as a co-defendant (aider and abbettor), and these counts charge commission of the crime of gambling and owning and operating a gambling establishment in violation of sections 970 and 973 of the Penal Law, and that the defendants were not inhabitants of or usually or publicly resident within the State of New York.

The special inquiry officer found that gambling and owning and operating a gambling establishment and being a common gambler under sections 970 and 973 of the New York Penal Code are not crimes involving moral turpitude. We agree that the offenses set forth in counts fourteen through twenty-one, and, so far as we can tell from the certificate of conviction, those offenses described in counts twenty-two through thirty-two, are not crimes involving moral turpitude. If appellant is excludable for the commission of a crime involving moral turpitude prior to entry, it is on his plea of guilty to count one. We agree that Mr. S—, in pleading guilty to count one, pleaded guilty to the entire count.

Count one indicts the defendants in broad terms of violating six sections of the Penal Code, and the indictment then states, not as overt acts or as substantive counts, but as "parts of the conspiracy," the following agreements: Parts (1) to (5) relate to the setting up and operating of the restaurant and casino. Parts (6) and (7) relate to the obtaining of a local figure to sign leases as tenant of the property, the leases to be "conditioned upon the granting of a summer liquor license," to procure in successive years the necessary liquor and other licenses, to conceal from federal and New York State liquor and tax authorities the identity of the true principals. Parts (8) to (10) relate to obtaining a local figure to act as a respectable "front" for the organization, and set forth the aim of the restaurant to serve excellent food and offer superior entertainers to attract as guests a moneyed clientele. Part (11) alleges establishment of checking accounts in false names in which to deposit the checks taken in the casino. Part (12) alleges the establishment of a dummy corporation to pay the expenses of the operation. Part (13) alleges the stock was to be held in the dummy corporation and officers and directors thereof were to be selected so as not to disturb the true owners in their beneficial enjoyment. Part (14) alleges that distorted financial statements were to be prepared and issued by accountants "to heighten the illusion" that the restaurant was a *bona fide* enterprise and to mislead the New York and federal liquor

and income tax authorities. Part (15) alleges the defendants should share in fixed proportions the net profits of the gambling operations. Part (16) alleges the defendants should utilize the capital of the corporate defendant for their personal use without regard for and in violation of statutory injunctions regarding the use and transfer of corporate capital, property and stock. Part (17) alleges the defendants should withhold and divert from the person in whose name the restaurant operation was conducted, the true records and should conceal and destroy these records.

Of the 42 overt acts which then follow, two overt acts, (15) and (24), refer to the "defendants" without naming specific names. Overt acts (13), (23) and (27) state that S— was a copartner in operating the casino and the gambling at Arrowhead Inn, and that he was in daily attendance at the casino and conferred with and issued instructions to employees.

Section 881 defining "uttering forged instruments" has three sections. Section 889, defining "forgery in the third degree" (pp. 4 and 5, Appendix, special inquiry officer's decision), has four subsections, each defining or describing many different kinds of acts. It is counsel's contention that these sections are divisible and that from the indictment you cannot tell what subsections of these statutes, particularly section 889, appellant is alleged to have conspired to violate, or what sections or subsections he pleaded guilty to. The rules of criminal pleading do not require the same degree of detail and technical precision in an indictment for conspiracy in stating the object of the conspiracy as is required when the indictment charges the substantive offense. *Thornton* v. *United States*, 271 U.S. 412, 423 (1926), and *Wong Tai* v. *United States*, 273 U.S. 77 (1927), and cases cited therein. The indictment was sufficient to advise the defendant of what he had to meet, and sufficient to protect him against subsequent prosecution for the same offenses. The indictment states clearly, particularly in count one, paragraphs 4 and 17 (pp. 3 and 5, indictment) that the acts recited therein were done "to conceal" the identity of the true principals from, and "to mislead," the New York State Liquor Authority and the state and federal income tax authorities. It is our belief that the conspiracy count includes crimes involving moral turpitude.

The certificate of conviction sets forth clearly enough the fact that appellant pleaded guilty to three crimes, (1) conspiracy, (2) gambling, and (3) owning and operating a gambling establishment in violation of section 970 of the Penal Law. The offenses to which he pleaded guilty, as described in the certificate of conviction, are set forth in "the first count, the 14th to the 21st counts, inclusive, and the 22nd through the 32nd counts, inclusive." There is nothing in the certificate of conviction to indicate that appellant pleaded

697

guilty to only part of the conspiracy count. A defendant does not plead guilty to part of a count.[4] He must plead either "guilty" or "not guilty" to the entire count. We have been unable to discover a case, statute, or precedent of any kind to support counsel's contention that it is possible to "split a count," and to plead guilty to part of a count only. Suppose a count charges a defendant with conspiring to steal a watch and a ring. He cannot say, "I conspired to steal the watch but not the ring." He must plead "guilty" or "not guilty" to the entire count, and if he denies having conspired to steal the ring, he would, of course, plead "not guilty" to the entire count.

What is the effect of a guilty plea? The rule is stated in many cases, and we will cite only a few. *Rader v. United States*, 288 F.2d 453 (C.A. 8, 1959), 185 F. Supp. 224, 230, declares, "This plea of guilty has the same force and effect as a conviction by a jury." *Harris v. United States*, 288 F.2d 790 (C.A. 8, 1961), holds, "Defendant's plea of guilty was an admission of his guilt and a 'waiver' of all nonjurisdictional defects and defenses and an admission of all the facts averred in the information," citing *Lipscomb v. United States*, 273 F.2d 860, 865 (C.A. 8, 1960).

*Williams v. United States*, 290 F.2d 217 (C.A. 5, 1961), also states that a plea of guilty is a judicial admission of all of the elements of the crime and no proof is needed. "It is as conclusive as the verdict of a jury," says *United States v. Swaggerty*, 218 F.2d 875 (C.A. 7, 1955). See also *Newalk v. United States*, 254 F.2d 869 (C.A. 5, 1958); *Thomas v. United States*, 290 F.2d 697 (C.A. 9, 1961), wherein the court held that by his plea of guilty the appellant foreclosed his right to raise objections to the manner in which evidence upon which he was indicted was obtained. See also *Hall v. United States*, 259 F.2d 430 (C.A. 8, 1958); *Edwards v. United States*, 256 F.2d 707 (C.A. D.C., 1958); *Berg v. United States*, 176 F.2d 122 (C.A. 9, 1949); *Kercheval v. United States*, 274 U.S. 220 (1927); *Friedman v. United States*, 200 F.2d 690 (C.A. 8, 1953); and *United States v. Parker*, 292 F.2d 2 (C.A. 6, 1961). *Maye v. Pescor*, 162 F.2d 641 (C.A. 8, 1947), states that the hearing on a petition for a writ of *habeas corpus* is not a substitute for the functions of the trial court and that, "The record does not purport to set out all the facts presented to or known by the United States Attorney, and we cannot go outside the record for the facts" (*Conklin v. Cozart*, Warden, 158 F.2d 676 (C.A. 5, 1946)). The plea of guilty admitted all the facts charged in the indictment. See also, *Dalton v. Hunter*, 174 F.2d 633, 635 (C.A. 10, 1949); *Bugg v. Hudspeth*, 113 F.2d 260 (C.A. 10, 1940); and

---

[4] Rule 11, Federal Rules of Criminal Procedure, Title 18, also permits the defendant, with the consent of the court, to plead *nolo contendere*.

*Norris* v. *Hudspeth*, 114 F.2d 1007 (C.A. 10, 1940); *Thornberg* v. *United States*, 164 F.2d 37 (C.A. 10, 1947); *Lindsay* v. *United States*, 134 F.2d 960 (C.A. 10, 1943), cert. den. 319 U.S. 763; *Spencer* v. *Hunter*, 139 F.2d 828 (C.A. 10, 1944); *Hawley* v. *Hunter*, 161 F. 2d 825 (C.A. 10, 1947). Therefore, the irregularities in procedure occurring before entry of the plea became harmless and do not constitute any basis for the vacating of the judgment. *United States* v. *Hoyland*, 264 F. 2d 346 (C.A. 7, 1959), points out that to hold otherwise would render every judgment based on a guilty plea open to collateral attack, motion to vacate judgment, *etc.* (pp. 349, 352).

In *United States* v. *Ben Grunstein and Sons Co.*, 127 F. Supp. 907 (D.C. N.J., 1955), the court said, "Surely, if, after a criminal verdict against him, overruling his denial of guilt, one is not permitted to make further denial, he should not be permitted to do so, when, instead of denying guilt, he has previously formally admitted it. Indeed at times a plea of guilty is given greater scope than is a judgment of conviction after trial, as where the parties are not the same in the two proceedings. 31 A.L.R. 261, 278 (1924); 18 A.L.R.2d 1287, 1290 (1951); 5 Wigmore, *Evidence*, secs. 1066, 1346, 1671a."

Many cases concerned with the effect of a plea of guilty arise when the defendant concludes that the plea of guilty was a mistake, either after he has served a portion of his sentence and wishes to be released from confinement, or when the sentence following his plea is much more severe than he expected. In *Friedman et al.* v. *United States*, 200 F.2d 690 (C.A. 8, 1952), the indictment consisted of four counts, the first two counts were conspiracy counts, and the last two counts alleged substantive offenses. The defendant corporation pleaded guilty to one of the substantive counts and not guilty as to others. The individual defendants pleaded guilty only to one of the conspiracy counts, conspiring to defraud the Government. The principal defendant, an officer of the corporation, expected a fine. In fact, he was the only defendant to be given a prison sentence. The other defendants were given suspended sentences and placed on probation. The principal defendant sought to withdraw his guilty plea. The court discussed at length the effect of pleas of guilty, the circumstances under which pleas may be withdrawn, and stated that a guilty plea "is not a mere admission or extrajudicial confession of guilt; it is as conclusive as the verdict of a jury," and the "defendant who enters a plea of guilty has no legal right to withdraw the plea" (citing cases).

The alien in the instant case is somewhat in the position of *Friedman, supra*, in that the punishment for his offense is greater

699

than he expected, not in the matter of a prison sentence, but in that it renders him excludable from the United States. See, particularly, discussion of "collateral consequences" of a guilty plea in *United States* v. *Parrino*, 212 F.2d 919 (C.A. 2, 1954).

Counsel argues that there is no substantive count in the indictment charging a violation of section 881, uttering a forged instrument, and that respondent cannot be convicted upon a trial for conspiracy unless one or more overt acts alleged in the indictment be proved. The contention that appellant participated in the operation of the gambling establishment but did not participate in the aspects of the conspiracy which related to forgery ignores the basic nature of the crime of conspiracy. Even if it were possible for him to plead guilty to only *part* of the conspiracy count, he must still have been found guilty of participation in the entire combination. The fact that a person is not found guilty of the substantive offense does not prevent his conviction of the conspiracy to commit it. The cases hold that if there is concert of design there need not be participation in every detail of its execution, or even knowledge of the scope of the conspiracy. It is not necessary to detail the evidence of the conspiracy in the indictment. If there is a "meeting of the minds," an understanding and an agreement with all parties working together toward a single design or purpose, the existence of the conspiracy may be inferred. *Telman* v. *United States*, 67 F.2d 716 (C.A. 10, 1933), cert. den. 292 U.S. 650. A plea of guilty to conspiracy admits *the existence* of the conspiracy as charged, as well as the defendant's *participation* therein. *United States* v. *American Packing Co.*, 113 F. Supp. 223 (D.C. N.J., 1953).

Where the conspiracy has been conclusively established, slight evidence connecting accused therewith will suffice, and it is not necessary to connect him directly with the actual crime committed. *Luteran* v. *United States*, 93 F.2d 395, affirming *United States* v. *Buck*, 18 F. Supp. 213, cert. den. *Luteran* v. *United States*, 303 U.S. 644, reh. den. 303 U.S. 668.

The general rule is that a party coming into a conspiracy or scheme to defraud at any stage of the proceeding, with knowledge that an illegal scheme or conspiracy is in operation, becomes responsible for all acts done by any of the other parties in furtherance of the common design. We will refer only to a few of the many cases. In *Levy* v. *United States*, (C.A. Wash.) 92 F.2d 688, the court held that it was proper to instruct the jury that the accused, joining in a conspiracy to defraud by use of the mails, would be guilty of overt acts by coconspirators, whether immediately participating therein or not. See also, *Harris* v. *United States*, 48 F.2d 771; *Edwards* v. *Commonwealth*, 74 S.W.2d 949, 254 Ky. 492;

*Skelly* v. *United States* and *Berman* v. *United States*, 76 F.2d 483 (C.A. 10, 1935), cert. den. 55 S.Ct. 914, 295 U.S. 757; *People* v. *Darr*, 179 Ill. App. 130.

The New York courts follow what appears to be the universal rule, that a *prima facie* case of conspiracy having been established, evidence of every act of the individual conspirators done in furtherance of the common purpose was admissible. *People* v. *Connolly*, 253 N.Y. 330, 171 N.E. 393 (1930); *People* v. *Van Tassel*, 156 N.Y. 561, 51 N.E. 274 (1898); *People* v. *Peckens*, 153 N.Y. 576, 47 N.E. 883 (1897); *People* v. *Miles*, 192 N.Y. 541, 84 N.E. 1117 (1908); and *People* v. *Candib*, 129 N.Y.S.2d 176 (1954).

Appellant having pleaded guilty to the conspiracy count, it is unnecessary for us to go to the facts of the case or the "overt acts" alleged. The plea of guilty relieves us of that necessity. Actually, there are many overt acts set forth which were done to effect the object of the conspiracy after the conspiracy had been formulated and agreed upon. The aims of the group associated with appellant at Saratoga Springs could not have been accomplished without the false front features of the scheme described in the indictment. The beverage license was essential to the operation of the restaurant and gambling operation. The same may be said of the portion of the scheme relating to depositing the checks received by the gambling organization in checking accounts which operated under false names. The fact that appellant does not admit that all the overt acts set forth in the indictment were done by him, and that he did not plead guilty to all the substantive counts, has no effect whatever upon his plea of guilty to count one. We find that appellant is inadmissible to the United States as a person who was convicted prior to entry on a plea of guilty to a general conspiracy stated in one count to commit, among other offenses, the crimes of forgery in the third degree and uttering a forged instrument, which are crimes involving moral turpitude.

The special inquiry officer was correct in finding that as the conviction for the crime under consideration occurred in December 1953, prior to the respondent's first reentry on July 19, 1960, he was then not admissible to the United States. Therefore, when he last reentered the United States in March 1961 he was not returning to a lawful residence in the United States, and he was not entitled to admission as a returning resident without an immigration visa.

The Board adopts the findings of fact and affirms the conclusions of law of the special inquiry officer.

ORDER: It is ordered that the appeal be and is hereby dismissed.

701